PRATT & al., in Equity, versus JAMES C. PHILBROOK.

A contract made for the sale and purchase of property, obtained by the concealment of facts material, going to the essence of the contract, and affecting the whole bargain, will be rescinded.

Whether the omission, on the part of the defendant, to give information, the concealment of which is complained of, was the result of forgetfulness, or a positive intention to conceal important facts, may not, *it seems*, be very material.

Although the party who seeks to' rescind a contract on the ground of concealment of material facts, may have confirmed the contract after acquiring knowledge of some of the facts concealed; yet, if sufficient facts were unknown to him at the time of the confirmation, to authorize a rescision, such confirmation cannot effectually operate to prevent it.

The opinion of the Court, in *Pratt & al., in Equity,* v. *Philbrook,* 33 Maine, 17, reconsidered and affirmed.

BILL IN EQUITY, to rescind an exchange of property between the plaintiffs and defendant.

The same parties had been before the Court at a previous time, when the plaintiffs' bill, as it then stood, was. dismissed upon demurrer, without costs for the defendant. *Pratt & al.* v. *Philbrook,* 33 Maine, 17.

The case is now presented upon bill and answer, and proof taken by both parties.

The material facts appear in the opinion of the Court, and in the report of the case referred to as previously heard.

*Eastman, Emery & Clifford,* for plaintiffs.

I. The law of rescision for fraud or mistake, is this:—
"Whenever *suppressio veri,* or *suggestio falsi* occurs, and more especially both together, they afford sufficient ground for setting aside any release or conveyance." *Smith v. Richards,* 13 Pet. 26; *Torrey v. Buck,* 1 Green. Ch. 12; *Shugart v. Thompson,* 10 Leigh, 436; *McAdoo v. Tublett,* 1 Humph. 105.

II. Whether the party representing a fact knew it to be false, or made the assertion without knowing whether it was true or false, is wholly immaterial. *Smith v. Richards,* 13 Pet. 26; *Harding v. Randal,* 15 Maine, 332; Story's Eq. Jur. § 193; *Read v. Walker,* 13 Ala. 799; *Bradley v. Chase,* 22 Maine, 511; *Daniel v. Mitchell,* 1 Story, 173; *Glassel v. Thomes,* 3 Leigh, 113; *Hammond v. Allen,* 2 Sum. 387; *Harrison v. Stowers,* Walker, 165.

III. The misrepresentation must be of something material. It must be not only something material, but that in regard to which the one party places known trust and confidence in the other. *Smith v. Richards,* 13 Pet. 26; *Whaley v. Eliot,* 1 A. K. Marshall, 343; Story's Eq. Jur. § 195; *Halls v. Thompson,* 1 S. & M. 443; *Ayers v. Mitchell,* 3 S. & M. 683; *Pringle v. Samuel,* 1 Litt. 43; *Perham v. Randolph,* 4 How. Miss. 435; *Stiles v. Sherman,* 34 Maine, 344; *Smith v. Babcock, & al.,* 2 W. & M. 206, 207; *Tucker v. Woods,* 12 J. R. 190; *Mitchell v. Sherman,* 1 Freem. Ch. 127; *Beckwith v. Kouns,* 6 B. Mun. 222.

IV. As to ratification of the contract after knowledge of facts concealed. *Warren v. Daniels & al.,* 1 W. & M. 111, 112; Per WOODBURY, J., in *Mason & al. v. Crosby,* 1 W. & M. 363; Per STORY, J., in *Hammond v. Allen,* 2 Sum. 387; *Tripp v. Tripp,* Rice's Ch. 84; *Carr v. Callaghan,* 3 Litt. 365.

V. Though there may be no fraud in fact in making a contract, yet a total inability in one party, produced by his own neglect, to fulfil his part of the contract, is in contemplation of law, equivalent to fraud. *Mitchell v. Sherman,* 1 Freem.

Ch. 127; *Smith* v. *Belters,* 1 Stew. & Port. 107; *Long* v. *Brown,* 4 Ala. 622.

VI. As to how far the answer is to be taken as true. *Forsaith* v. *Clark,* 3 Wend. 638; *County* v. *Geiger,* 1 Call, 191; *Gordon* v. *Lowell,* 21 Maine, 253; *Dunham* v. *Yates,* 1 Hoff. C. R. 185; Daniels' Ch. Pl. & Pr. 986, note; *Randall* v. *Phillips & al.* 3 Mason, 378; *N. E. Bank* v. *Lewis,* 8 Pick. 113; *Obrien* v. *Elliot,* 15 Maine, 127; *Vallentine* v. *Farrington,* 3 Edw. Ch. 53; *Paynes* v. *Cole,* 1 Munf. 373; *Cartwright* v. *Godfrey,* 1 Mun. 425; *Town* v. *Needham,* 3 Paige's Ch. R. 546; *Dunham* v. *Gates,* 1 Hoff. Ch. R. 185; *Mason* v. *Rosevelt,* 5 Johns. Ch. R. 534; *Farnham* v. *Brooks,* 9 Pick. 212; *Phillips* v. *Richardson,* 4 J. J. Marsh. 212; Daniels' Ch. Pl. & Pr. 984, and note.

VII. As to other evidence:—

1. Circumstances are sometimes more convincing than direct testimony, and, in the development of fraud, furnish almost the only source to be relied upon. *Gould* v. *Williamson,* 21 Maine, 273; *Farnham* v. *Brooks,* 9 Pick. 212.

2. The conversations of a defendant with other persons, on a subject of a kindred character, near the time of the transaction, and illustrating his intention, are competent evidence for the complainant. *Warren* v. *Daniels & al.,* 1 Wood & M. 109.

3. The testimony of a single witness will sustain an allegation of a bill, against the denial of an answer, when the defendant has confined himself to a literal denial of the allegation, in the words in which it is made, without meeting the real object and effect of the charge. *Amos* v. *Heatherly,* 7 Dana, 45; Daniels' Ch. Pl. & Pr. 989, and note 991, note 1.

*Evans,* for respondent.

This case has been before the Court on a former occasion, and the bill was then dismissed on demurrer, for want of equity. Subsequently, leave to amend the bill was granted, and the case was reinstated upon the amendments filed.

The abstracts prepared by the plaintiffs do not show what the amendments are, nor how much of the bill, as it now

stands in the abstracts, was before the Court on the former hearing.

The opinion of the Court, however, it is believed, covers the whole ground of the plaintiffs' claim, as now exhibited, and another demurrer might have been safely taken. [See the case in 33 Maine, 17.]

The plaintiffs are therefore to show some substantial grounds of equity, not embraced in the bill as originally exhibited, or it will be again dismissed summarily. None such, it is contended, are set forth.

The testimony offered by the plaintiffs goes almost wholly, if not entirely, to facts and circumstances which the Court has already pronounced insufficient to maintain the bill.

The field of inquiry is therefore limited. We contend, that the decision of the Court already given, disposes of the case as it is now exhibited, unless it shall feel disposed to re-consider the opinion then given, or to re-examine the case upon its merits as originally presented.

If so, we contend that no case is made out, calling for the interposition of the equitable powers of the Court, in the manner prayed for.

The answer is responsive throughout. It denies not only all fraud, misrepresentation and concealment, but all the material facts and circumstances as they are alleged in the bill, in which such fraud is supposed to consist, and by which it is evidenced.

In no essential particular is the answer overcome by the plaintiffs' proofs, but on the contrary, we maintain that it is supported in its material averments by the evidence offered by the defendant.

1. We contend that Emery had full knowledge that the freight on the shingles had not been paid.

2. There was no misrepresentation in regard to the charter party of the Hampton.

Emery knew that defendant was not a party to it, and that it was not in his possession, that he could only describe it from hearsay and recollection.

The testimony as to what defendant said on this matter, is not sufficient to overcome the answer.

3. Even if there were erroneous representations in regard to the shingles, the plaintiffs have suffered no injury from that cause; and if they have, their remedy at law is ample.

If the shingles had been retained 60 days, they would have been worthless.

4. The representations charged to have been made as to the ownership of the 50 M. of other lumber on board the Hampton, whether true or false, have no possible connection with this case.

That Emery never understood he had a resort to them, is apparent from his total silence in regard to them, in all his letters and instructions to his son. No inquiry, even, was suggested.

The defendant's representations were undoubtedly misunderstood or misrepresented by the witness.

5. That the shingles were worth $80 per M. in California, and that T. C. Emery would have ample time to reach there, &c. These and similar objections are so palpably matters of opinion and judgment, about which Emery could judge as well as anybody, that they require no comment. Emery acted upon his own avowed knowledge.

6. In regard to the 1-6th of the cargo of the Chief, we contend that Emery was fully informed of the title of the respondent, before the contract was entered into.

7. If Emery was deceived in the outset, which we deny, he was undeceived by the letters of Deshon & Co., of Feb. 1 & 4, 1850; and thereupon, instead of rescinding, or claiming to rescind the contract, ratified or affirmed it.

8. If plaintiffs have lost any thing by reason of defect of title in Philbrook to the 1-6th, they have a perfect remedy at law, by suit on the covenant in the bill of sale.

9. But they have lost nothing from such defect. If Philbrook's title had been perfect, how would plaintiffs have been better off than now?

The absolute owners of the residue of the cargo realized

nothing. The losses sustained are abundantly accounted for, attributable to the great depression of lumber, &c., in California, the enormous expenses attending it, &c. To some extent to the bad management of the consignees of the Chief. The same fate attended the lumber sent by other vessels.

10. A large portion of the testimony introduced by plaintiffs, is entirely inadmissible, much of it on leading questions, much of it of conversations and speculations, and correspondence between other parties, with which defendant had no connection. Plaintiffs' interference with witnesses, and manner of obtaining evidence, is objectionable, and renders the whole liable to suspicion.

The principles of law applicable to the case, are too familiar to need the citation of authorities. A few only will be named. Representations made to others, not admissible. *Bradley* v. *Chase,* 22 Maine, 527; *Crocker* v. *Lewis,* 3 Sum. 8.

Equity will not interpose where there is an adequate remedy at law. R. S., c. 96, § 10; 2 Story's Eq. § 794; *Woodman* v. *Freeman,* 25 Maine, 540.

The Court say, "the law may be considered now as conclusively settled, that if fraudulent representations have been made, respecting personal property or personal rights, relief for injuries occasioned thereby can only be obtained in an action at law, and a court of equity will not entertain jurisdiction;" citing, among other cases, *Clifford* v. *Brooke,* 13 Ves. 131; *Russell* v. *Clarke's Executors,* 7 Cranch, 89; 2 Story's Com. § 84.

Equity does not interfere when damages would be adequate relief.

In 25 Maine, *ubi sup.,* the English cases are very fully reviewed, and the result stated on page 554, that such is the rule there. So of the American cases, and on p. 560, it is declared that the jurisdiction of the Court to give relief by way of damages, cannot be sustained. *Woodman* v. *Saltonstall,* 7 Cush. 181; *Thayer & al.* v. *Smith,* 9 Met. 470.

Recovery of damages would be the adequate relief, contemplated by law. It is a case sounding in damages.

Misrepresentations of value, or of other matters, which are only of opinion, will not be relieved against. *Warren* v. *Daniels*, 1 Wood and Min. 90; *Hugh* v. *Richardson*, 3 Story, 659.

Where an injury will admit of pecuniary compensation, a court of equity will never interpose. *Ingersoll* v. *Donnels*, 5 Met. 124.

Application for rescission must be made as soon as the cause for it is discovered. *Ayers & Mitchell*, 3 S. & M. 683.

The Court have already decided that here was *affirmation*, which of course precludes rescission. 33 Maine, 17.

TENNEY, C. J.—This case has been before the Court at a previous time; and upon a demurrer by the defendant, the bill was dismissed. *Pratt & al.* v. *Philbrook*, 33 Maine, 17. Upon leave to amend, granted by the Court, the bill has been essentially changed, an answer has been filed, and proofs taken by both parties. The whole case has been argued upon its merits; many of the questions involved at the first hearing are identical with those now presented. But we think there is no occasion, to reconsider the opinion then given, so far as the principles therein settled, in relation to the facts of the case at that time, are applicable to the facts proved, as the case is now presented. But important matter is at this time exhibited, which was not then before us, and calls for an examination, and the application of equity principles thereto.

Certain facts are not disputed, which are important in their connection, with others, which are a subject of controversy. The offer made by the defendant to the plaintiffs touching the exchange of certain lumber which he claimed to own, and which was on the way to California, and then supposed by both parties to be of great value at that place, for the Thornton House, furniture, &c., in Saco, is dated Jan. 19, 1850. The letter of the plaintiff Emery, in which he accepted this offer, is dated Jan. 23, 1850, and directed to the defendant at Augusta. On Jan. 26, 1850, papers were prepared to

carry into execution the agreement, but it appears that they were not fully completed and delivered till a few days afterwards. On Jan. 23, 1850, Thornton C. Emery, the son of one of the plaintiffs, left Saco for California, for the purpose of being there to receive and take charge of the lumber for his father, as early as possible; he sailed from New York on Jan. 28, 1850, for California, and arrived at San Francisco on April 26, 1850. The ship Hampton, in which the defendant had shipped the shingles, that he undertook to sell to the plaintiffs in part consideration for the Thornton House, arrived at the same place, on Feb. 27 or 28, 1850. A power of attorney was prepared and forwarded by the plaintiff Emery, to his son Thornton; bills of sale of the lumber and other papers connected therewith were also sent at the same time, which were received by the latter, on the way or immediately after his arrival in California. A long time before his arrival, the shingles on board the Hampton had been sold, and the ship departed upon another voyage. The bark Chief had arrived, but all right of the defendant in the cargo therein, was denied by those in charge, and Thornton C. Emery had nothing to do under his agency.

It is alleged in the plaintiff's bill, that immediately after accepting the defendant's proposal, agreeably to his suggestion and advice, when he made the same, the plaintiff Emery, dispatched his son T. C. Emery to California, expressly that he might be there in season, as the agent to take the actual possession, management and disposal of the shingles and the boards, which had been shipped by the defendant.

The defendant denies in his answer, that T. C. Emery went to California by his advice for the purpose of taking charge of the shingles and the boards; but admits, that at the request of Moses Emery he did write to T. C. Emery, when in Massachusetts, and urged him to go to California, and gave several reasons therefor as his own which were suggested by said Moses Emery. It also appears by a postscript to the letter which the plaintiff Emery sent to the defendant, accepting the proposal to make the exchange of property, that T.

C. Emery would take passage to California from New York the then next Monday, and he therein expresses a wish that the defendant would consign the shingles in the Hampton to him, and let him act as the defendants' agent, until he should hear that the writings were closed between the parties. And the evidence is plenary, that the defendant knew, that it was the intention of the plaintiff Emery, that his son was to be in California, to take charge of the shingles in the Hampton, and the boards in the Chief, as soon as possible after their arrival, before the writings were finished; that he gave it as his opinion, that the time would be amply sufficient, to enable him to arrive there before there could be any disposal of the shingles, inasmuch as, by the contract, the Hampton was to remain there for sixty days after arriving in port at California, before the shingles would be disposed of.

It is alleged in the bill, that after the ship Hampton sailed on her voyage, and before the 19th day of January, 1850, to wit, about the first of December, 1849, the defendant duly authorized one Bodfish, who was then about going to California, by way of the Isthmus, to sell said shingles for him, on their arrival in California, and with the proceeds of the sale, to pay the said master the freight of the same in California. That the defendant, on Jan. 16, 1850, also wrote and sent by mail a letter to George Davis, the master of the Hampton, in effect waiving his right, if any he had, by any contract to require the said Davis to wait with said ship and shingles in California, as aforesaid, for the owner to appear and take the same, and requesting and fully authorizing said Davis to sell and dispose of said shingles, without instructing him in any manner as to the time or place of sale, or limiting the price, and that said authority to said Bodfish, and said letter to said Davis, and the waiver, request and authority therein contained, were in full force, when said proposal and supposed exchange were made, and were never afterwards revoked; all which the defendant ever fraudulently concealed from the plaintiffs. And the plaintiffs aver, that had they known or suspected that the defendant had author-

ized Bodfish or Davis, so to sell the said shingles, they would not have made the said supposed exchange.

To the foregoing part of the bill the defendant answers, that between Jan. 1 and 19, 1850, he told Emery, that he had not consigned the shingles to any one, and had no agent in California, and inquired whether some one should not have the care of them, and that Emery replied, that he thought it would be well; and the defendant thereupon said, that he had confidence in the skill and honesty of Davis, the master of the Hampton, and that he intended to write to him, and request him to take the management of the shingles, and to do the best he could with them, for the defendant, and manage them in all respects, as if they were his own property. Emery thought he could not do better as the matter then stood, and remarked that such course would not prevent him from consigning them to any other person afterwards, if he should choose to do so. That the defendant did write, and forward by mail to Davis, a letter containing a request to that effect, and at the time the letter was sent to Davis, Emery knew the contents thereof by information from the defendant, and, as he believes, Emery saw and read the letter after it was written and before it was sent.

And the defendant further answers, that he never appointed William Bodfish at any time his agent to sell and dispose of the shingles, or any part thereof, and never gave him any authority or power to sell or dispose of the same, or to advise or assist in selling them.

The letter, proved to have been signed by the defendant, contains the following: — "January 16, 1850. — Capt. Davis, Dear Sir; — As I have not consigned my shingles to any one, I wish you to take the management of them yourself, and do the best you can for me, and manage in every respect, as you would if they were your own. My bill of lading says 80 M., the man who delivered them made me pay for 82 M. You may possibly find as many on board, as the bill I had to pay for." (Signed,) " J. P. Philbrook." This letter is shown to

have been mailed on Jan. 16, 1850, and received by Davis at San Francisco.

It is shown that Bodfish had in his hands a bill of lading signed by Albert Ballard, dated Sept. 7, 1849, of 80 M. of shingles, shipped by the defendant, which he exhibited to Davis, the master of the Hampton, at San Francisco.  It does not appear in what mode Bodfish obtained the bill of lading, but it appears in the defendant's letter of Jan. 16, 1850, to Davis, that he had received a bill of lading of the shingles.

It was proved, that by the custom of merchants and ship-masters, the bill of lading of merchandise in the possession of a person, at the port of discharge of the vessel in which it is shipped, is taken as evidence of that person's authority from the owner to receive and dispose of his cargo.

The shingles on board the Hampton, shipped as the proper-ty of the defendant, were sold by Bodfish about the 20th of March, 1850, within three weeks of their arrival at San Fran-cisco, for the sum of $7 a thousand, by the consent of Davis, the master of the Hampton, and the proceeds paid to Robin-son, Arnold & Sewall, the ship's agents in San Francisco.

Was the plaintiff Emery informed in any mode, that the defendant had authorized the master to take the management of the shingles shipped by him, in the Hampton, in every re-spect as he would do, if they were his own ?  The answer alleges, that before the proposal was made by the defendant in writing to Emery, to exchange the property therein refer-red to, he had written to Davis, and, he believes, that the let-ter was read by Emery.  This may be, perhaps, responsive to the bill, though it was before the defendant's proposal to exchange, and consequently did not enter into the contract made by the acceptance of the proposal.  But, we think, from the evidence in the case, it is abundantly proved, that at the time the writings were about being prepared, and afterwards, that Emery was advised of no such fact; and that the proof is of that character, which overcomes the answer according to established principles in equity proceedings, if the answer,

standing uncontradicted, could be regarded as notice to Emery, that such authority had been given.

S. V. Loring deposes, that on Jan. 26, 1850, when the defendant and Emery talked over the bargain with a view to have the writings prepared, it was said among other things by the defendant, that the Hampton was to lie sixty days after her arrival at California, for the owner of the shingles to take them, before which time they could not be landed or sold. No letter to Davis or bill of lading delivered to Bodfish was mentioned.

T. C. Emery testifies, that defendant said, there would be plenty of time for him, as his father's agent, to arrive in California, and receive the shingles, as the Hampton could not leave under sixty days, after her arrival.

John Fenderson, who witnessed the bills of sale of the shingles, and who was present at the time referred to by Loring, deposes, that the understanding was, that Thornton C. Emery was to go to California, and receive the lumber. Defendant said the shingles were to remain in the ship, quite a length of time, before they could be sold; the defendant does not recollect the time mentioned. But defendant said Thornton would have ample time to get there and receive the lumber. Defendant told Emery there was no claim on the shingles for freight, and that they could not be sold for freight. The testimony of S. W. Sawyer is corroborative of the statements of the foregoing witnesses, upon this point. And that of A. J. Walker is of similar import. After the news of the sale of the shingles in California had been received in Saco, the defendant is proved to have said, that the captain had no right to sell the shingles under sixty days after the arrival of the ship in California; that he had sold them within that time, and that Emery was dissatisfied about it; but that he would have been no better off if they had not been sold till the arrival of Thornton C. Emery in California.

The evidence, which has been adverted to, is totally inconsistent with the answer of the defendant, that Emery had notice of the authority given by the former to Davis to do

with the shingles in all respects as he would do, if they were his own, and is satisfactory, that the authority given to Davis, under the letter to him of Jan 16, 1850, and that to Bodfish, arising from his possession of the bill of lading made to the defendant, without explanation as to the manner in which that possession was obtained, was wholly unknown to Emery till after the sale of the shingles.

Whether the omission on the part of the defendant to give this information was the result of forgetfulness, or a positive intention to conceal important facts, may not be very material; the effect was the same. But it is somewhat remarkable, that in the various conversations between the defendant and Emery, which took place in a very few days after the letter of the former was sent to Davis, that he should not have referred to it, but on the other hand, should have made statements, and given opinions, contradictory to that, which might well be supposed to take place by his authority, if his purposes were honest.

The defendant sold to Emery the shingles on board the ship Hampton, by bill of sale, dated Jan. 26, 1850, "to be delivered to said Emery or his authorized agent on the arrival of said ship, at her place of unlading in California, as specified in the contract between the shippers of the cargo, and owners of said ship and master." In the contract referred to, the master and owners agree " to lade said lumber on board said ship, and transport the same with reasonable dispatch to the bay of San Francisco, and deliver the same to such person, and at such accessible point, as the shippers may direct, allowing to said shippers sixty running lay days, at said point. If, within forty-five days from the arrival and notice to the consignee, the freight be not settled, the master is authorized to sell lumber enough to pay his freight as aforesaid."

It has already been held, when this case was previously before us, that this contract being referred to in the defendant's bill of sale to Emery, and it being stated in the defendant's offer to exchange, dated Jan. 19, 1850, that he was to pay the freight on the shingles and the sixth part of the cargo

of the Chief, the contract could not be rescinded, notwithstanding the defendant made representations inconsistent therewith. And the sale of the shingles having been made within forty-five days after their arrival in California, in violation of that contract between the master and owners and the shippers, without the fault of the defendant, he could not be responsible. But the facts now before us, in this respect are unlike those stated in the original bill.

Emery had a right to suppose, and must have believed, that he purchased the shingles, subject only to the contingent lien for freight, (which the defendant represented he would pay) not to be enforced, if not discharged, till forty-five days after their arrival, and then so far only as to raise enough to cover the freight, and the balance to be secure from sale, for fifteen days longer. In fact, at the time of the exchange, the defendant had given unqualified power, under which all the shingles could be sold, on the day of their arrival, if that was thought proper by the person or persons who had the authority from him. This authority he had then recently given; it was unrevoked when he took the conveyance of the Thornton house and other property. He never revoked it, or attempted to do so; and it was unknown to Emery; and nothing was disclosed, by which he could, in the exercise of the greatest care have ascertained, that the stipulation on the part of the master and owners had been waived by the defendant.

The concealment was material, and went to the essence of the contract, and affected the whole bargain. The shingles and the sixth part of the cargo of the Chief was the consideration of the property conveyed by Emery. The conveyance by each party was entire; if null in part, it was so altogether. The contract was indivisible, and so intended to be by the parties.

It is true, that the plaintiffs' agent, contrary to the expressed opinion of the defendant, and the hopes of Emery, did not arrive at California within forty-five days after the arrival of the Hampton, and could not have prevented the sale of the shingles for the freight, under the contract with the master

and owners, if they had insisted upon their extreme rights. It appears also, that the shingles were sold for as large a sum as they would have brought after the agent was ready to take them in charge, if they had been unsold. But the ground for a rescindment of the contract lies deeper. The purchase of the shingles was made by Emery under a belief of the existence of facts, which were untrue. The defendant knew their want of truth, and he could not have been ignorant of the erroneous belief of Emery, into which he had been instrumental in leading him.

If Emery had known, that the defendant had given a power, by which the shingles could be sold at any time after their arrival in California, instead of being secure from a sale, even for their freight, (which both parties must have supposed very insignificant, when compared with the entire value,) for the term of forty-five days afterwards, he might well have hesitated to convey the valuable real estate and personal property, which was the consideration of the shingles and a sixth part of the cargo of the Chief. If the agent should not arrive as soon as the ship, in the place of the shingles themselves would be perhaps substituted the personal claim of their value against the defendant; and in the place of the agent, sent out at great expense, to make sale of the property in small quantities, if found more advantageous, after ascertaining at different places the state of the market, would be under the power, persons having other and perhaps paramount engagements, and desirous to dispose of the lumber as soon as possible for such prices as were offered.

The plaintiffs aver in their bill, that if they had known that the defendant had waived the right to have the shingles secure from sale, as stated in the contract with the master and owners of the Hampton, or had suspected it to have been so, they would not have made the exchange of property. The facts shown, authorize the conclusion, that this averment was true, and the actual state of the matter was such, that had it been known to the plaintiffs, the contract of exchange would not have been made.

Have the plaintiffs ratified the contract of exchange of property, after they became possessed of all the facts, of which they now complain? When the case was before the Court at a former time, it appeared by the bill, that dissatisfaction was expressed by the plaintiffs on account of alleged concealment of material facts. But it appeared that new negotiations resulted in new arrangements between the parties, and the plaintiffs were thereby precluded from making an effectual claim for a rescindment of the contract. But the ground on which the plaintiffs would be entitled to the decree, which they seek, is that which could not have been known and understood at the time, when the mutual arrangements were made, and the transfers by one and the other allowed to stand. And facts unknown to the plaintiffs, when they affirmed the contract, if sufficient to authorize its rescission, cannot effectually operate to prevent it.

Some transactions, which according to the testimony may have transpired after the plaintiffs had knowledge that the shingles were sold by authority of the defendant, long before they could have been disposed of by virtue of his contract with the master and owners of the Hampton, are relied upon as evidence of a ratification. This relates to a division of some beds, which were in the Thornton House, in July, 1850, after the plaintiffs had advices from T. C. Emery, in relation to the sale of the shingles. This evidence is a recital of some conversation between Emery and the defendant. It is quite indefinite, and nothing indicating with certainty that it had reference to the property, which was a subject of the exchange in January, 1850. No facts are mentioned showing that the witness, who states it, had any occasion to recollect the conversation; and there is nothing which is satisfactory, that it is correctly reported. Other evidence exhibits a conversation, which may have been the same, very differently. And it appears, that not far from the same time, the plaintiffs had deliberately concluded to institute the present suit, and had previously presented the defendant his bills of sale and

all other papers received from him, and demanded a reconveyance of the property, which he had received.

We are of opinion, that the contract of exchange of property entered into by the parties, in January, 1850, should be set aside, as founded in the concealment of material facts by the defendant, from the plaintiffs, which were an essential portion of the facts in the case; that the conveyance of the real estate from Emery to the defendant should be rescinded, and that the personal property or its avails, should be restored and paid to the plaintiffs, after deducting from the avails, if the property or any part thereof has been sold, the expenses attending the sale, &c.

It appears that the Thornton House was burnt in January, 1851, and that certain amounts of money due upon policies of insurance, or already in the hands of a receiver, are awaiting the final decision of the suit, to be paid to the person or persons to whom they belong, according to the decree to be made; and that the defendant had the use of the Thornton House from the time of the conveyance to the time it was destroyed. And it is the opinion of the Court, that the defendant should pay a reasonable rent for the same, deducting whatever is reasonable for repairs, if any were made.

The plaintiffs are entitled to a decree in conformity with the foregoing views. But some matters growing out of the policies of insurance upon the property and the destruction of the same by fire, and the rent thereof, must be submitted to a master, before a final decree can be made.

HATHAWAY, APPLETON, MAY, and GOODENOW, J. J., concurred.